## Ricci *v.* Vesta Coal Company, Appellant.

Argued October 9, 1942.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, RHODES, HIRT and KENWORTHEY, JJ.

310

*William A. Challener, Jr.,* with him *Joseph C. Spriggs, Frank McC. Painter* and *William A. Challener,* for appellant.

*John J. Moschetta,* for appellee.

OPINION BY CUNNINGHAM, J., October 30, 1942:

The appeal in this workmen's compensation case is from the judgment entered by the court below upon an award by the referee affirmed by the board, to the dependent widow of Luigi Ricci, employed as a roadman by the defendant coal company, as compensation for his death on March 18, 1939.

The record contains such a wealth of competent testimony that the employee's death was the direct result of an "injury by an accident in the course of his employment," within the meaning of Section 301 of the reenacting and amending statute of June 4, 1937, P. L. 1552, 77 PS §411, that we agree with the following excerpt from the comprehensive opinion of GIBSON, J., speaking for the court below: "There is no real difficulty with this case. The record displays a lot of heat by counsel for the parties involved, without any real effort to determine the precise facts. It also displays a tendency to delay the final award and some unique pleadings full of argument and discussion."

During the night shift on February 17, 1939, Ricci was engaged, along with his "buddy," Alfred Thomas, in carrying heavy iron rails, forming a track for mine cars, from one place to another in the progress of the work in the mine. Thomas was the only eye witness of the untoward event relied upon by claimant as con-

stituting the accident. Excerpts from his testimony read: "Q. I call your attention to the date and ask you if anything happened unusual on that night? A. We were carrying a rail and he slipped off the end of the *tee* and *hit* his side. That is the way he complained of the injury. Q. Right, or left side? A. Left side. Q. What was the size of this rail? A. Fifteen feet long, about 450 pounds. Q. Was it thirty pound iron? A. Yes. Q. As you were carrying this rail, were you front, or back? A. Back. Q. Could you see the person on the other end carrying the rail? A. Yes. Q. And you say that while you were carrying this rail, he slipped? A. He was on one side of the branch and I was on the other and he *went to step on a tie and fell off it and fell seven or eight inches.* He was in a bentover position anyhow. Q. Did you see him make any motion? A. He just grunted. Q. The rail fell down to the ground? A. No. Q. Did he hold on to it? A. Yes. ...... Q. When you saw him slip, did anything happen to you? A. Certainly. When it jarred him, it jarred me on the other end of the rail. Q. Did you hold on to the rail, or did it fall? A. I held on. Q. Where did you carry the rail to after this affair? A. About thirty feet. Q. Did he make any complaint? A. When we got there we threw the rail down and he leaned against a post and I asked what was the matter and he said that he hurt his side when he slipped ......" (Italics supplied.) After stating it was then time to eat, Thomas continued: "While we were eating, he walked away and he went to the breakthrough and started to vomit. Q. Did he come back? A. Yes and sat down. Q. Did he do any work that evening? A. None whatever. Only walked around to keep warm" [1]

---

[1] It is agreed that the word "tee" in the above quoted testimony should read "tie." A controversy arose between the parties as to whether the witness, Thomas, in the same sentence, used the expression "and *hit* his side," or the phrase "and *hurt* his side."

Appellant made an effort to attack the credibility of Thomas by showing that when interrogated by several mine officials, subsequent to the date of the occurrence and before any serious results had appeared, he stated that he had seen nothing unusual while they were carrying the rail. The explanation given by Thomas was that in making these statements he was merely carrying out a request of Ricci that if anyone inquired whether he was hurt in the mine he (Thomas) should tell them he knew nothing about it; and that when he asked Ricci why he made that suggestion Ricci replied, "I am an old man and if I lose any work, they might fire me." While under oath before the referee, Thomas positively averred that his above quoted testimony relative to the occurrence was the exact truth. This question of the credibility of the witness was exclusively for the referee and board; they accepted Thomas's explanation and based their findings of fact upon his sworn testimony.

Ricci received first aid from a nurse at the mine hospital who strapped his chest and back with adhesive tape. After remaining at home for a few days he endeavored to return to work on the night of February 21st, but was unable to perform his duties and was sent out of the mine to his home.

On February 25th, Ricci's son called the mine hos-

---

After the board had filed its opinion, counsel for appellant presented a petition asking that the record be corrected to read "hurt" instead of "hit." Attached to this petition was an affidavit of the stenographer that by inadvertence she transcribed her notes as reading "hit" when the word "hurt" should have been used. Counsel for the claimant filed an answer, to which was attached an affidavit of the witness, stating that he had used the word "hit." The board dismissed the petition for correction of the record. In the light of the medical testimony, we deem the matter of little importance. It is not contended on behalf of claimant that Ricci sustained external violence to the physical structure of his body.

pital and requested that a doctor be sent to see his father. Dr. Hawkins came, removed the adhesive tape, gave Ricci several injections, and the next day had him removed to Southside Hospital, where he died from pneumonia on March 18th. Appellant did not call Dr. Hawkins.

There was testimony that Ricci was a strong man, over six feet in height and weighing 230 pounds; that he worked regularly and had had no illness except an attack of pleurisy in the preceding year, 1938. At the request of claimant, an autopsy was conducted by Doctors T. E. Morgan, (who had treated Ricci for pleurisy in 1938) D. H. Edwards, and J. H. Shannon.

No useful purpose would be served by reviewing separately the testimony of these physicians relative to the procedure at the autopsy. The material conditions disclosed by the autopsy were thus described by Dr. Morgan: "In attempting to remove the left lung, it was removed with difficulty. The lower lobe was found to have a marked amount of thick tenacious pus, possibly 500 c.c. present. In the lower lobe of the left lung, when we attempted to remove it, we found a recent denuded area at the upper margin of the left lower lobe, approximately two inches in length and this denuded area was at the midaxillary line. In the pleural cavity in that area was an adhesive fibrous tag that corresponded to the denuded area in length."

As to a causal connection between the accident and the death, the three physicians present at the autopsy were unanimously of opinion that the fatal pneumonia was of traumatic origin. Doctors Morgan and Shannon concurred in the opinion thus expressed by Dr. Edwards: "Taking into consideration the facts as related in the history in which he was carrying a heavy rail and slipped and held onto the rail and the fact that upon autopsy we did find an area two inches in length on the upper border of the left lower lobe of the left lung

and a tag of pleura on the chest wall, which corresponded to the area on the outer margin of the lung, it is my professional opinion, that while lifting this rail he tore an old pleural adhesion, which opened an avenue of infection which produced pneumonia, with resulting death."

Excerpts from the testimony of Drs. Morgan and Shannon indicate the foundation for the unanimous opinion. Dr. Morgan said: "From what I got from the history, as presented by Mr. Thomas, at Waynesburg, together with the gross anatomical and microscopic examination of the tissue, it is my professional opinion that Luigi Ricci's death was the direct result of traumatic injury, which resulted in pleurisy, pneumonia, empyema and death. Q. What traumatic injury are you referring to? A. The torn adhesions of the lower left lobe ...... Taken from the history, we base the lacerations of the lung from the history. Q. What was the history? A. That he was lifting a rail in the mine and jerking caused inner thoracic pressure and ruptured that adhesion. Q. Is that your professional opinion? A. Yes."

Dr. Shannon stated that the fact Ricci complained of pain and vomited showed "something of an untoward nature had occurred inside the chest wall" and continued: "The fact that he really did not get sick for two or three days would give a chance for the infection to start up, which had started when he went to the Southside Hospital, developing into pneumonia and empyema, and my opinion is that the tear of the lung happened when the sudden strain was put on the chest wall, tearing the adhesion loose that was present previous to the accident, as shown by chronic pleurisy. ......"

There was practically no contradiction of this medical testimony—merely the expression by a doctor called by appellant of his opinion that if the adhesion had been

torn a month before the autopsy the denuded portion of the left lung would not have been as "raw" as the physicians who performed the autopsy described it.

In our opinion, the evidence accepted by the compensation authorities clearly brought this case within the rule announced by the Supreme Court in *Adamchick v. Wyoming Valley Collieries Co.*, 332 Pa. 401, 3 A. 2d 377, to the effect that a claimant in a case of this kind has the burden of proving both an accident and an injury resulting therefrom. We find abundant evidence, both direct and circumstantial, upon this record that claimant's husband met with an "accident" in the course of his employment in which he sustained injuries which were the direct cause of his death a month later.

This is not a case wherein it is contended that an employee while performing his work in the *usual manner* suffered a strain of some organ, or a sudden onset of pain, which entitled him to compensation for a resulting disability. See discussion in *Apker v. Crown Can Co. et al.*, 150 Pa. Superior Ct. 302, 28 A. 2d 551. It is a case in which a totally unexpected and fortuitous event—a slip and a seven or eight inch fall—entirely foreign to the manner in which the work was intended to be, and usually was, performed, occurred with fatal results to the employee. In our opinion, it falls within the first class of compensable deaths from pneumonia defined and illustrated by Mr. Justice STERN in *Parks v. Miller Printing Machine Company et al.*, 336 Pa. 455, 9 A. 2d 742, namely, "cases where there is an involuntary, unexpected, fortuitous happening which causes the disease." Among other illustrative cases there cited is *Dopkin v. Philadelphia and Reading Coal & Iron Co.*, 296 Pa. 71, 145 A. 707, where an employee received an accidental injury, resulting in arthritis or inflammation of the hip joint and terminating in pneumonia.

The mere fact that the employee had, as a result of

a prior illness, the adhesions described by the medical witnesses, or that they rendered him more susceptible to the fatal injuries here shown than he would otherwise have been, does not prevent his death from being compensable under the statute: *Clark v. Lehigh Valley Coal Co.*, 264 Pa. 529, 107 A. 858; *Gausman v. Pearson Co.*, 284 Pa. 348, 131 A. 247; and *Royko v. Logan Coal Co. et al.*, 146 Pa. Superior Ct. 449, 451, 22 A. 2d 434.

By a stipulation of counsel this appeal was advanced for argument at Philadelphia. It was argued October 9th and we have given it priority in disposition because the compensation due this dependent widow has been withheld entirely too long. The assignments of error are severally overruled.

Judgment affirmed.